**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Monica Hutchinson, | No. CV-11-00785-TUC-CKJ |
| Plaintiff, | **ORDER** |
| v. | |
| American Family Mutual Insurance Company, et al., | |
| Defendants. | |

Pending before this Court is Defendant Thom Wadlund's ("Wadlund") Motion for Summary Judgment.  On December 9, 2011, Wadlund filed a Motion to Dismiss Plaintiff's Complaint.  (Doc. 4).  This Court's April 9, 2012 Order converted Wadlund's Motion to Dismiss into a Motion for Summary Judgment.  (Doc. 18).

I.      *Factual Background[1]*

American Family Mutual Insurance Company ("American Family") is an insurance company with thousands of employees.  Wadlund operates an insurance

---

[1] The Factual Background is derived from Plaintiff's Supplemental Statement of Facts except where otherwise noted.  Plaintiff's Supplemental Statement of Facts was filed under seal pursuant to a Stipulation between the parties.  (Doc. 34). Pursuant to the Stipulation, the Plaintiff's Supplemental Statement of Facts and attached exhibits were stipulated by the Parties to be filed under seal because they referenced financial and other proprietary records and summaries, which were the subject of an earlier stipulated protective Order.  (see Doc. 29).  While the Court references facts derived from Plaintiff's Supplemental Statement of Facts in this Order, the Court has not mentioned any financial or proprietary information or records.  Further the facts discussed in the Court's Order are discussed in Defendant's Response to Plaintiff's Supplemental Statement of Facts, which was not filed under seal.  (Doc. 40).

agency.  On January 1, 1993, Wadlund entered into an agency agreement with American Family.  Pursuant to the agreement, Wadlund could only sell American Family insurance products and is required to meet American Family's production, profitability and service requirements.  Joel Helixon, the agency sales manager with American Family, explained that profitability means that Wadlund cannot continually write unprofitable insurance policies.  (Doc. 40 at ¶26).  If Wadlund failed to reach American Family's production or profitability requirements, American Family would give him a notice of undesirable performance, which could result in termination of the agency agreement.[2]

The agency agreement further requires Wadlund to maintain a trust fund account and permits American Family to audit that account.  It permits American Family to monitor Wadlund's performance and to change its payment obligations to Wadlund without his consent and without prior notice.  It also provides for a death benefit to Wadlund's legal representative in certain circumstances.  The agency agreement contains a non-solicitation clause, prohibiting Wadlund from soliciting American Family customers for a period of one year after the termination of the agency agreement.   Each year, employees of American Family work with the agents including Wadlund to prepare a business plan outline.  However, participating in the business plan outline exercise is a discretionary practice, which Wadlund chooses to perform.  (Doc. 40 at ¶11).  Mr. Helixon goes over the business plan outline with Wadlund, only to provide advice and guidance.  *Id.*

Wadlund is free to hire whomever he chooses.  However, Wadlund is not permitted to hire any solicitor, broker, or other licensed individual without the written consent of American Family.  (Doc. 40 at ¶¶18, 47).  Wadlund is required to use an American Family authorization form when hiring someone.  Further, any of Wadlund's prospective employees who would represent American Family products to the public, must be approved by the agency sales manager, the state sales director and the sales vice

---

[2] While Wadlund does not dispute that American Family set minimum production standards, he argues that since he was consistently above those minimum standards, they do not apply to him.

president of American Family before Wadlund can hire them.[3]

If Wadlund terminates an appointed employee, he is required to adhere to the procedures set forth by American Family and use the necessary American Family forms. However, these procedures and forms are merely to remove the person from the American Family computer system. (Doc. 40 at ¶55). After removal from the computer system, Wadlund could retain the person as an employee of his agency, so long as the person had no contact with the public concerning American Family products. *Id.*

American Family provided Wadlund with an agency administration manual. This manual included procedures to be used when interviewing candidates for employment, potential interviewing questions, office organization ideas, and agency operations. American Family also provides agents with an employee handbook. However, Wadlund was not required to use the manual or the handbook.[4] (Doc. 40 at ¶¶19, 21, 23).

The agents are responsible for training their own employees. (Doc. 38, Ex. R). However, the education division of American Family provides training materials, simulations and courses to assist agents in training their staff. *Id.* American Family asserted that there is no requirement that the agent's use all of these materials (Doc. 40 at ¶¶45, 46), however, there are certain required courses, services and tools, which an agent's employee must complete. (Doc. 38, Ex. R).

Plaintiff has been a licensed insurance producer in Arizona since 2004. Prior to joining Wadlund's agency, she was an agent of American Family pursuant to an agency agreement, similar to the agreement between Wadlund and American Family.[5] Prior to

---

[3] Stasheena Ward, a prospective employee of Wadlund, was rejected by American Family because of her poor credit history. Subsequently, Wadlund refused to hire her because American Family refused to appoint her as a licensed representative and he had no other available positions.

[4] Wadlund states in his declaration that he did not use the agency administration manual or employee handbook while operating his agency. (Doc. 40 at ¶23). Plaintiff did not cite to any admissible evidence to support the notion that Wadlund used the agency administration manual when hiring employees or setting up his agency.

[5] Wadlund does not dispute that Plaintiff was at one time an agent of American Family. However, Wadlund argues that Plaintiff's treatment as an American Family agent is irrelevant since the issue before the Court is the relationship between American

becoming an American Family agent, Plaintiff was required to submit to American Family an application for employment, a consumer credit report authorization and a motor vehicle report authorization.  American Family then conducted extensive training with the Plaintiff.  Plaintiff described in detail how American Family instructed her on where she would operate her agency and how to improve her financial performance.  American Family provided Plaintiff with computers and software to use in her agency and required that she keep her agency open on certain days and work a certain number of hours per week.  American Family determined which insurer Plaintiff could use for errors and omission coverage.   The marketing of her agency was controlled by American Family.  American Family had final approval over any marketing materials that utilized a company logo or mentioned American Family in any capacity and American Family further dictated to Plaintiff how she should display marketing materials in her office.  Furthermore, while Plaintiff was an agent of American Family, her financial performance was monitored closely by American Family.   American Family countered that not all agents are treated the same and Wadlund was specifically treated differently than other agents. [6]  (Doc. 40 at ¶12)

Beginning in 2010, Plaintiff ceased being an agent of American Family and began working at Wadlund's agency.  Prior to being hired, Plaintiff was required to fill out an American Family application for employment.   Wadlund argued there was no requirement that he use any particular form of employment application, and he chose to use the American Family application.  (Doc. 40 at ¶36).  However, since Plaintiff was being hired as a licensed representative who would have communication with the public concerning American Family products, American Family had to review her application for employment before she could be hired for that position.  *Id*.

On October 26, 2010, Mr. Helixon requested that American Family approve

---

Family and Wadlund.  (Response to Plaintiff's Supplemental Statement of Facts, p. 2).

[6] Plaintiff does not specifically allege that Wadlund was under similar control by American Family, nor does she cite to any authority to support such an allegation.

Plaintiff as a licensed office staff employee for Wadlund.  Mr. Helixon's email provided that since Plaintiff was a former agent, she should be processed as a transfer.  (Doc. 38 at Ex. N).  Mr. Helixon explained that the term "approval" in the letter referred to approval for Plaintiff to be appointed as American Family's representative not approval for Plaintiff to be hired by Wadlund.  (Doc. 40 at ¶41).  Also, on October 26, 2010, Ranger Durand, the American Family Vice-President of sales, received the American Family Office Staff Appointment Checklist, appointing Plaintiff as a staff person in Wadlund's agency.  Another American Family email explained that Plaintiff would be working as a customer service representative and that Plaintiff would be processed as a "transfer within the company" because of her prior status as an agent with American Family.  Mr. Helixon testified that the discussion of Plaintiff's transfer within the company related to the transfer of her license not her employment within American Family.  (Doc. 40 at ¶44).

After being approved by American Family, Plaintiff was required to sign a document entitled American Family Agreement to License Agent's Office Employee. (Doc. 38, Ex. J).  This agreement was signed by Plaintiff, Wadlund and a representative from American Family, and became effective on November 1, 2010.  *Id*.  It provides that Plaintiff is appointed by American Family as its licensed insurance sales representative. *Id*.  This agreement further explicitly provides that Plaintiff is an employee of Wadlund and not American Family and provides that Wadlund is responsible for the training, direction, supervision and delegation of authority to the Plaintiff.  However, the authority delegated by Wadlund is limited by an endorsement to the agreement and further must be in compliance with the rules and regulations of American Family.  *Id*.

On November 1, 2010, Mr. Zurfluh sent an email to Wadlund approving Plaintiff as a customer service representative and identifying mandatory online training courses for Plaintiff to complete.  (Doc. 38 at Ex. K).   Later that day, Mr. Zurfluh sent Plaintiff an email informing her that American Family had approved her employment as a customer service representative in Wadlund's agency.   The email provided:

The email instructed Plaintiff to read and review the code of conduct document

with her employer, and complete an online training course called American Family Code of Conduct and Business Ethics.  (Doc. 38 at Ex. L).  The code of conduct and business ethics course was required so Plaintiff would perform her duties on behalf of American Family in an ethical and legal manner.  (Doc. 40 at ¶39).  After being hired, a representative from American Family signed a customer service representative appointment form, which was sent to American Family by Wadlund so that Plaintiff could access American Family's computer database.  (Doc. 40 at ¶40).

After being hired, Plaintiff was required to study American Family's policies and procedures and complete additional testing on the materials she studied.  American Family tracked Plaintiff's completion of these courses of instruction, which included a variety of subjects.[7]  Plaintiff testified that her role as a customer service representative was identical to her role as an agent, with the exception of payroll.  However, Wadlund testified that in addition to his responsibilities to solicit business, he is also responsible for running the business, locating and maintaining an office, hiring personnel, purchasing office supplies, arranging for advertising, evaluating and selecting promotion materials, and training and supervising employees.  (Doc. 40 at ¶52).

Plaintiff, in her declaration, stated that she performed her duties as a customer service representative in Wadlund's agency according to the training she received from American Family.  She only utilized American Family forms to complete her tasks and the computer and software she used to perform her job were supplied by American Family.  Wadlund never provided her with any training or supervision.  She was informed of errors in her applications, changes in coverage, and new product lines directly from American Family employees who would call or email her about the issue.  If an error had been made, Plaintiff would attempt to rectify the situation with the American Family employee, without Wadlund's involvement.  (Doc. 38).  Wadlund testified that he decided whether to hire Plaintiff, where she would work, what hours she

---

[7] An American Family witness, Mr. Zurfluh, testified that the only mandatory training given by American Family was training relating to American Family's legal obligations.  (Doc. 40 at ¶48).

would work, her salary, and it was his decision to fire her.  (Doc. 40 at ¶54).

Plaintiff explained that after she became pregnant, Wadlund created a hostile work environment.  He addressed her rudely, expressed anger over her physician appointments, and on one occasion, refused to speak with her when she was late due to a physician's appointment.  On one occasion, Plaintiff entered the office and overheard Wadlund say on the telephone "one of my girls is pregnant, I'm gonna have to get rid of her."  Plaintiff testified that at that time, she was the only pregnant employee in Wadlund's office. Wadlund then terminated Plaintiff's employment with the agency on April 19, 2011. (Doc. 38).

## II.   *Procedural History*

On November 14, 2011, Plaintiff filed a Complaint in the Pima County Superior Court alleging discrimination based on pregnancy in violation of Title VII of the Civil Rights Act of 1964 against American Family, American Standard Insurance Company of Wisconsin ("American Standard"), Wadlund and Jane Doe Wadlund; improper interference with contract against Wadlund; and intentional infliction of emotional distress against Wadlund. Wadlund filed a Notice of Removal on December 5, 2011.

On December 9, 2011, Wadlund filed a Motion to Dismiss asserting that Plaintiff had failed to state a claim upon which relief could be granted pursuant to Fed.R.Civ.P. 12(b)(6).   (Doc. 4).   On February 22, 2012, American Family filed its Answer to Plaintiff's Complaint.   (Doc. 12).   On April 9, 2012, this Court converted Wadlund's Motion to Dismiss into a Motion for Summary Judgment and permitted the parties to conduct discovery regarding the issues raised in Wadlund's Motion.  Plaintiff then filed a Supplemental Opposition to Defendant Wadlund's Motion for Summary Judgment on November 21, 2012.  (Doc. 35).  Wadlund filed a supplemental reply on December 7, 2012.  (Doc. 39).  On March 18, 2013, the Court heard oral arguments from the parties. (Doc. 44).

*III.     Summary Judgment Legal Standard*

Summary judgment may be granted if the movant shows "there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."   Rule 56(c), Federal Rules of Civil Procedure.   The moving party has the initial responsibility of informing the court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.   *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met the initial burden, the opposing party must "go beyond the pleadings" and "set forth specific facts showing that there is a genuine [material] issue for trial." *Id.*, 477 U.S. at 248, 106 S.Ct. at 2510*,* internal quotes omitted. The nonmoving party must demonstrate a dispute "over facts that might affect the outcome of the suit under the governing law" to preclude entry of summary judgment. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).   Further, the disputed facts must be material. *Celotex Corp.*, 477 U.S. at 322-23.   In opposing summary judgment, a plaintiff is not entitled to rely on the allegations of her complaint, Fed.R.Civ.P. 56(e), or upon conclusory allegations in affidavits. *Cusson-Cobb v. O'Lessker*, 953 F.2d 1079, 1081 (7th Cir. 1992).   Further, "a party cannot manufacture a genuine issue of material fact merely by making assertions in its legal memoranda."   *S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines) v. Walter Kiddle & Co.*, 690 F.2d 1235, 1238 (9th Cir. 1982).

The dispute over material facts must be genuine.  *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510*.*  A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*   A party opposing a properly supported summary judgment motion must set forth specific facts demonstrating a genuine issue for trial.  *Id.*  Mere allegation and speculation are not sufficient to create a factual dispute for purposes of summary judgment. *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995) (per curiam).  "If the evidence is merely colorable or is not significantly

probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50, 106 S. Ct. at 2511.  However, the evidence of the nonmoving party is to be believed and all justifiable inferences are to be drawn in his favor.  *Id.* at 255.  Further, in seeking to establish the existence of a factual dispute, the non-moving party need not establish a material issue of fact conclusively in his favor; it is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  *T.W. Elec. Serv.*, 809 F.2d 626, 631 (9th Cir. 1987).

Additionally, the Court is only to consider admissible evidence.  *Moran v. Selig*, 447 F.3d 748, 759-60 (9th Cir. 2006) (pleading and opposition must be verified to constitute opposing affidavits); *FDIC v. New Hampshire Ins. Co.*, 953 F.2d 478, 484 (9th Cir. 1991) (declarations and other evidence that would not be admissible may be stricken).

## IV.    Analysis Title VII

Pursuant to 42 U.S.C. §2000e-2(a)(1), "it shall be unlawful employment practice for an employer to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. §2000e-2(a)(1).  Title VII defines an employer as a "person engaged in an industry affecting commerce who has fifteen or more employees … and any agent of such a person."  42 U.S.C. §2000e(b).

Wadlund alleges that he was Plaintiff's employer and that since he employed fewer than fifteen (15) people, he was not an employer as defined by Title VII and is not subject to a Title VII claim.  Plaintiff does not dispute that Wadlund was her direct employer or that Wadlund had fewer than 15 employees.  However, Plaintiff argues that Wadlund meets the statutory definition of an employer and is thus subject to a Title VII suit under three theories:  First, that Wadlund is American Family's agent, second, that Wadlund and American Family are Plaintiff's joint employer, and third, that Wadlund and American Family are an integrated enterprise.

1

2    *V.      Agency*

3          Plaintiff argues that Wadlund is subject to a Title VII claim because he is an agent

4    of American Family, which employs over 15 people.  *See Childs v. Local 18, Intern.*

5    *Broth. Of Elec. Workers*, 719 F.2d 1379, 1382 (9th Cir. 1983) a*brogated on other*

6    *grounds*.   In C*hilds*, the Ninth Circuit agreed that an employer with fewer than 15

7    employees is an employer as defined by Title VII, if it is an agent of another employer

8    with 15 or more employees.   *Id.* at 1382.  An agency relationship exists when two parties

9    agree that one party (agent) shall act for or on the other's behalf (principal), subject to the

10   principal's control, and the agent's acts are those of the principal.  *Nelson v. O.E.*

11   *Serwold*, 687 F.2d 278, 282 (9th Cir. 1982).

12         Wadlund argues that even if he was American Family's agent for employment

13   purposes, Title VII liability does not extend to him since he is an individual.  *See Pink v.*

14   *Modoc Indian Health Project, Inc.*, 157 F.3d 1185, 1189 (9th Cir. 1998)(holding that civil

15   liability for employment discrimination does not extend to individual agents of the

16   employer who committed the violations).  The Court is not persuaded by this argument.

17   While the Ninth Circuit has held that supervisory employees are protected from liability

18   in their individual capacities, individuals can be held liable in their official capacities.

19   *Miller v. Maxwell's Intern. Inc.,* 991 F.2d 583, 587-588 (9th Cir. 1993).   Furthermore,

20   Wadlund has repeatedly asserted that he is an independent contractor and not an

21   employee of American Family.  As such, the lack of individual liability of an employer's

22   employees is not applicable to Wadlund.

23         In the alternative, Wadlund asserts that while he is an agent of American Family

24   for insurance purposes, he is not an agent of American Family for employment purposes

25   and thus is not subject to suit under Title VII under an agency theory.  Wadlund argues

26   that for Title VII employment discrimination actions, the agency relationship between

27   American Family and Wadlund must be for employment purposes.  Several other circuits

28   support this argument.  *See Swallows v. Barnes & Noble Book Stores, Inc.*, 128 F.3d 990,

     996  (6th  Cir.  1997)(holding  that  an  agent  within  the  context  of  employment

discrimination statutes must be an agent with respect to employment practices); *Deal v. State Farm County Mutual Ins. Co. of Texas*, 5 F.3d 117, 119 (5th Cir. 1993)(holding that an agent under Title VII must be an agent with respect to employment practices); *Nixon v. Northwestern Mutual Life Ins. Co.*, 58 F.Supp.2d 1269, 1275 (D. Kan. 1999)(holding that while an insurance agent is an agent with respect to sales of insurance, the court found no evidence that he was an agent with respect to the plaintiff's employment).

This Court agrees that while Wadlund is an insurance agent of American Family, that title alone does not create an agency relationship with respect to Title VII. *See Deal,* 5.F.3d at 119. Additionally, several courts have specifically held that an insurance agent is not an agent of the insurance company for employment discrimination purposes. *See Id.*; *Gibson v. American Income Life Ins. Co.,* Civil No. 98-1288-AS, 1999 U.S. Dist. LEXIS 10234 (D. Or. 1999); *Nixon v. Northwestern Mutual Life Ins. Co.*, 58 F.Supp.2d 1269, 1275 (D. Kan. 1999).

The Ninth Circuit in *Childs* applied traditional indicia of an agency relationship to determine if one employer was the agent of a larger employer pursuant to Title VII. *Childs*, 719 F.2d. at 1382-1383. The nature and extent of actual control over the agent by the principal is the main factor to consider in determining the existence of an agency relationship for Title VII purposes. *Laughon v. International Alliance of Theatrical Stage Employees*, 248 F.3d. 931, 935 (9th Cir. 2001). In analyzing the relationship, the Ninth Circuit has evaluated the smaller employer's ability to hire and fire its own employees, maintain its own accounts and independently conduct its daily business as determinative factors. *Id*.

Plaintiff alleges that she performed her role as a customer service representative based upon American Family's training, the computer and software she used were provided by American Family and she was required to comply with American Family's rules regarding the sales of American Family products. Wadlund did not supervise Plaintiff and she was informed of errors in her work related to American Family products by American Family and not Wadlund. Thus, American Family played a significant role in the training and development of Plaintiff's employment with Wadlund. Additionally,

American Family set minimum standards that Wadlund was required to meet or exceed. Thus Wadlund was not completely free to independently conduct his daily business as he was required to meet certain sales goals as set forth by American Family.  However, while minimum goals were set by American Family, Wadlund's daily activities were not supervised[8] and he had the authority to implement whatever measures he deemed necessary to meet American Family's minimum goals including the hiring of additional staff.  Additionally, with the exception of the premium fund trust account, there is no evidence establishing that Wadlund and American Family shared bank accounts or that American Family had any right of access to Wadlund's accounts.

American Family maintained control over which of Wadlund's employees may represent American Family's products to the public, however, American Family's control relates to the appointment to represent American Family's products and does not directly relate to the hiring of staff.  Thus, even if American Family declined to appoint a prospective employee, Wadlund is still free to hire that individual in a capacity that does not involve representing American Family's products to the public.[9]  Accordingly, Wadlund may hire whomever he chooses without American Family's influence as long as that employee does not sell or represent American Family products to the public. Additionally, Wadlund does not require approval from American Family to terminate the employment of one of his employees even if that employee had previously been appointed to represent American Family's products.

Wadlund states that he was solely responsible for the running of his business, locating and maintaining an office, purchasing office supplies, and supervising his employees. (Doc. 40)  Plaintiff has not presented any admissible proof to dispute this claim by Wadlund except to describe her treatment when she was an agent of American

---

[8] While Plaintiff alleges that her daily activities were supervised by American Family immediately after she was hired by Wadlund, Plaintiff has not presented any admissible evidence to infer that Wadlund was similarly supervised.

[9] Since Wadlund exclusively sells American Family products he could not hire anyone to sell insurance products or act as a customer service representative without American Family's approval.

Family and speculation that Wadlund must have been treated similarly.  However, mere allegation and speculation are not sufficient to create a factual dispute for purposes of summary judgment.  *Witherow v. Paff*, 52 F.3d 264, 266 (9th Cir. 1995) (per curiam).

At the time Plaintiff was hired, Wadlund made the decision to hire her, what hours she would work and how much she would be compensated for her work.  Further, it was solely his decision to fire her.  Based upon the information in the record and viewed in the light most favorably to the Plaintiff, the Court does not find that Wadlund acted as American Family's agent pursuant Title VII.

*VI.    Joint Employers*

An employer may be held liable under Title VII pursuant to a joint employer theory of liability.  *E.E.O.C. v. Pacific Maritime Association*, 351 F.3d 1270, 1275 (9th Cir. 2003).  Wadlund argues that Wadlund and American Family cannot be joint employers because he is an independent contractor of American Family and not its employee.  In support of this proposition, Defendant cites to cases, which hold that an insurance agent is an independent contractor of the insurance company.  S*ee Wortham v. American Family Ins. Group*, 385 F.3d 1139 (8th Cir. 2004); *McClure v. American Family Mut. Ins. Co.,* 29 F.Supp. 2d 1046 (D. Minn. 1998).  The Ninth Circuit has similarly held that insurance agents are independent contractors of an insurance company and not its employees for purposes of Title VII.  *Murray v. Principal Financial Group, Inc.*, 613 F.3d 943, 944-945 (9th Cir. 2010).

However, the cases cited by Wadlund address situations where the insurance agent brought suit against the insurance company.  In this case, an employee of the agent has brought a Title VII suit against the insurance company and this agent.  Thus, the Court must determine whether an employee of an independent contractor may file suit against the employer of that independent contractor under Title VII.

Where "one employer, while contracting in good faith with an otherwise independent company, has retained for itself sufficient control of the terms and conditions of employment of the employees who are employed by the other employer," a

joint employment relationship exists.  *Redd v. Summers*, 232 F.3d 933, 938 (D.C. Cir. 2000) *citing NLRB v. Browning-Ferris Industries of Pennsylvania, Inc*., 691 F.2d 1117, 1123 (3rd Cir. 1982).   The Ninth Circuit has similarly found that under certain circumstances an employee of an independent contractor may be jointly employed by the company that contracted with the independent contractor.  *Lopez v. Johnson*, 333 F.3d 959, 963 (9th Cir. 2003) (court applied the tests espoused in *Reed v. Summers*, to determine if an employee of an independent contractor who provided services for the government, was also an employee of the government for purposes of a discrimination suit against the government).   As such, the Court finds that Wadlund's status as an independent contractor does not preclude Wadlund and American Family's potential status as joint employers of Plaintiff for Title VII purposes.

Two or more employers may be considered joint employers if both control the terms and conditions of an employee's employment.  *Pacific Maritime Association*, 351 F.3d at 1275.  In *Pacific Maritime Association*, the Ninth Circuit reviewed the five factors listed by the Labor Department's regulations to determine whether two employers are joint employers.  These factors include "(A) the nature and degree of control of the workers; (B) the degree of supervision, direct or indirect of the work; (C) the power to determine the pay rates or the methods of payments of the workers; (D) the right, directly or indirectly to hire, fire, or modify the employment conditions of the workers; and (E) the preparation of payroll and payment of wages."  *Id*.  However this list is not exhaustive and in addition to evaluating those factors, The Ninth Circuit has applied an "economic reality" test.  *Id*.  In addition to the factors listed above, courts have also analyzed:

(1) the degree of the alleged employer's right to control the manner in which the work is to be performed; (2) the alleged employee's opportunity for profit or loss depending upon the alleged employee's managerial skill; (3) the alleged employee's investment in equipment or materials required for the alleged employee's task, or the employee's employment of helpers; (4) whether the service rendered required a special skill; (5) the degree of permanence of the working relationship; (6) whether the service rendered is an integral part of the alleged employer's business; (7) ownership of property or facilities where work occurred; (8) whether responsibility under the contracts between a labor contractor and an employer passes from one

labor contractor to another without material changes.

*Id.*   Courts must consider all factors relevant to a particular situation when applying the economic reality test.  *Id.*

Plaintiff asserts that while Wadlund does not have the requisite number of employees to satisfy the numerosity threshold for employer liability under Title VII, since Wadlund and American Family are joint employers, aggregated they have well over the 15 employee threshold.   Thus before the Court analyzes whether Wadlund and American Family were Plaintiff's joint employer, the Court must determine whether a joint employment theory permits the aggregation of employees to meet the employee threshold for Title VII liability.

This issue has not specifically been addressed by the Ninth Circuit and guidance from the other circuits is limited.   The Second Circuit discussed the aggregation of employees of two entities to meet the 15 employee threshold; however, the Court declined to decide whether employees of joint employers may be aggregated.  *Arculeo v. On-Site Sales & Marketing, LLC,* 425 F.3d 193, 195 (2nd Cir. 2005).   However, The court did provide some guidance on the issue.   The court discussed the EEOC Compliance Manual, which addressed the issue of aggregation, and provided:

> [t]o determine whether a respondent is covered, count the number of individuals employed by the respondent alone and the employees jointly employed by the respondent and other entities.

*Id*. at 200 quoting EEOC Compliance Manual §2-III(B)(1)(a)(iii)(b).  The court further discussed in dicta the difference between an integrated enterprise argument, where all the employees of both entities would be aggregated and a joint employment theory.  *Arculeo*, 425 F.3d at 199.  The court explained that "a joint undertaking by two entities with respect to employment may furnish justification for adding to the employees of one employer those employees of another who are jointly employed by the first, but such joint undertaking does not furnish logical justification for adding together all the employees of both employers, unless the circumstances justify the conclusion that all the employees of one are jointly employed by the other."  *Id.*

- 15 -

In *Sanford v. Main Street Baptist Church Manor, Inc.*, the Sixth Circuit discussed in detail the Second Circuit's reasoning in analyzing whether the employees of two entities could be aggregated to permit one of the entities to meet the Title VII, 15 employee threshold. *Sanford v. Main Street Baptist Church Manor, Inc.* 327 Fed. Appx. 587 (6th Cir. 2009). The Sixth Circuit recognized that several other jurisdictions have allowed aggregation in certain circumstances. *Id.* at 593-594 *citing Trainor v. Apollo Metal Specialties, Inc.,* 318 F.3d 976 (10th Cir. 2002)(considering whether temporary workers were sufficiently controlled as to be aggregated); *Burdett v. Abrasive Eng'g & Tech., Inc.*, 989 F.Supp. 1107 (D. Kan. 1997)(plaintiff could aggregate employees of staffing agency as long as those employees were staffed with the employer and employer exercised sufficient control over the employees).

The Sixth Circuit held that "aggregation of joint employees for the purposes of establishing the Title VII numerosity requirement is permissible when one joint employer exercises control over the employees of the other joint employer." *Sanford*, 327 Fed. Appx. at 594. This Court is persuaded by the reasoning of the Second and Sixth Circuits and the Court will aggregate those employees directly employed by Wadlund and those employees jointly employed by both Wadlund and American Family. However, since a theory of joint employment differs from a single enterprise theory, the Court will not combine all the employees of both entities, but only supplement Wadlund's employee total by those employees that are jointly employed by both Wadlund and American Family. *See Id; Arculeo*, 425 F.3d at 199.

Wadlund has demonstrated and Plaintiff has not contested the fact that during the calendar years 2010 and 2011, Wadlund never employed more than 4 people including the Plaintiff. (Declaration of Thom Wadlund, Doc. 4-1). Moreover, the evidence presented by Wadlund establishes that even if American Family exercised control over all of his employees as Plaintiff asserts, Wadlund did not exercise any control over any of American Family's employees. Thus for aggregation purposes, the Court will consider those individuals employed by Wadlund and those individuals jointly employed by Wadlund and American Family. However, since there are no individuals employed by

American Family who were jointly employed by Wadlund, even if the Court were to find that all of Wadlund's employees were jointly employed by American Family, the total aggregated number of employees remains at four. As such, Wadlund is not an employer as defined under Title VII under the theory of joint employment with American Family.

## VII.    Integrated Enterprise

"A Plaintiff with an otherwise cognizable Title VII claim against an employer with less than 15 employees may assert that the employer is so interconnected with another employer that the two form an integrated enterprise, and that collectively, this enterprise meets the 15-employee minimum standard." *Anderson v. Pacific Maritime Association*, 336 F.3d 924, 929 (9th Cir. 2003). The integrated enterprise test does not determine joint liability but does determine whether a defendant can meet the statutory criteria of an employer for Title VII purposes. *Id*. at 928. Since Wadlund had fewer than fifteen employees, the integrated enterprise test is applicable to determine if Wadlund can meet the statutory criteria of an employer under Title VII.

The four factors to determine whether two entities are an integrated enterprise are the "(1) interrelation of operations; (2) common management; (3) centralized control of labor relations; and (4) common ownership or financial control." *Kang v. U. Lim America, Inc*., 296 F.3d 810, 515 (9th Cir. 2002)

After weighing the factors, the Court does not find that the facts support a finding that American Family and Wadlund constituted an integrated enterprise. The record is devoid of evidence indicating that Wadlund and American Family shared facilities, shared bank accounts or that each company paid the others bills and paychecks. *See Id.* Thus interrelation of operations weighs against an integrated enterprise.

Wadlund was free to hire and fire his own employees and while American Family could dictate which of Wadlund's employees could represent American Family products to the public, American Family could not dictate who Wadlund ultimately hired for non-sales positions or fired from his agency. Accordingly, the most critical factor, centralized control of labor relations similarly weighs against an integrated enterprise. *See Id.*

- 17 -

Moreover, Wadlund and American Family were independent organizations that entered into an exclusive sales contract with each other.  While American Family sets profitability goals and retains authority to audit the premium trust fund account, which Wadlund is required to maintain, there is no evidence to indicate that American Family has authority to audit Wadlund's business accounts or that the two entities shared business accounts.  Thus the common ownership or financial control factor weighs against an integrated enterprise.

The only factor that weighs in favor of finding the entities are an integrated enterprise relates to common management.  Plaintiff asserts that she was supervised and trained directly by American Family and she was advised of mistakes in her work and provided feedback by American Family.  However, while the factor of common management weighs in favor of finding the two companies are an integrated enterprise, the remaining factors weigh against a finding of an integrated enterprise.

*VIII.   Intentional Infliction of Emotional Distress*

Pursuant to Arizona law, the three elements required to find liability based on the tort of intentional infliction of emotional distress are: (1) the conduct by the defendant must be extreme and outrageous; (2) the defendant must either intend to cause emotional distress or recklessly disregard the near certainty that such distress will result from his conduct; and (3) severe emotional distress must indeed occur as a result of defendant's conduct.  *Watts v. Golden Age Nursing Home,* 127 Ariz. 255, 258, 619 P.2d 1032, 1035 (1980).  Arizona courts have refused to allow plaintiffs to prevail in such claims unless defendant's conduct is found to be extraordinary. "A plaintiff must show that the defendant's acts were 'so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community.' " *Mintz v. Bell Atlantic Systems Leasing,* 183 Ariz. 550, 905 P.2d 559, 563 (Ariz.App.1995).

Plaintiff alleges that after she became pregnant, Wadlund addressed her rudely, became angry when she missed work due to physician appointments, refused to speak

- 18 -

with her for two days when she was late due to a physician appointment, slammed things angrily onto her desk, exclaimed to her that he had a life too, when she asked him what was wrong and once she overheard him on the phone stating that one of his girls is pregnant and he would have to get rid of her.  Plaintiff alleges that as a result of this treatment, she suffered severe emotional distress.

Assuming Plaintiff's version of events as true, the Court does not find Wadlund's behavior was extreme and outrageous.   Arizona recognizes the tort of intentional infliction of emotional distress as defined by the Restatement (Second) of Torts §46. *Davis v. First Nat. Bank of Arizona*, 124 Ariz. 458, 461, 605 P.2d 37 (Ariz. Ct. App. 1979) *disagreed with on other grounds; Godbehere v. Phoenix Newspapers, Inc.,* 162 Ariz. 335, 783 P.2d 781 (Ariz. 1989).

Pursuant to the Restatement (Second) of Torts:

> It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice," or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

Restatement (Second) of Torts §46, Comment d.  The Court's role is to determine in the first instance whether the acts complained of by Plaintiff can be considered extreme and outrageous.   Restatement (Second) of Torts § 46, Comment h.; *Cluff v. Farmers Ins. Exchange*, 10 Ariz.App. 560, 562, 460 P.2d 666,668 (1969).  "Even if a defendant's conduct is unjustifiable, it does not necessarily rise to the level of atrocious and beyond all possible bounds of decency."  *Nelson v. Phoenix Resort Corp*., 181 Ariz. 188, 199, 888 P.2d 1375 (Ariz. Ct. App. 1994).

The Court does not find that Wadlund's alleged behavior, while rude and unjustifiable, rose to the level of extreme and outrageous.

*IX.    Tortious Interference with Contract*

"Tort liability may be imposed upon a defendant who intentionally and improperly interferes with the plaintiff's rights under a contract with another if the interference causes the plaintiff to lose a right under the contract." *Snow v. Western Sav. & Loan Ass'n,* 152 Ariz. 27, 730 P.2d 204, 211 (Ariz.1986) (internal citations omitted). The five elements of the tort of interference with an employment contract are: (1) the existence of a contract relationship or business expectancy between plaintiff and a third party; (2) Defendant's knowledge that the contract exists; (3) defendant's intentional interference with the contract, which causes the third party to breach the contract; (4) defendant acted improperly; and (5) damage resulted to the plaintiff. *Bernstein v. Aetna Life & Cas.,* 843 F.2d 359, 366 (9th Cir. 1988) *citing Antwerp Diamond Exch. V. Better Business Bureau of Maricopa County,* 130 Ariz. 523, 530, 637 P.2d 733, 739-40 (1981) (for the first four elements); *Wagenseller v. Scottsdale Memorial Hosp*., 147 Ariz. 370, 710 P.2d 1025 (1985).

Wadlund argues that Plaintiff only had an employment relationship with him and thus he cannot interfere with his own contract. Plaintiff acknowledges that Wadlund could not interfere with his own contract but argues that she had an employment relationship with American Family and Wadlund interfered with that employment relationship. In order to sustain this claim, Plaintiff must establish that she had an employment relationship with American Family which Wadlund intentionally and improperly interfered with causing American Family to breach its employment relationship with Plaintiff.

Only third parties are liable pursuant to this tort. Thus, Wadlund cannot be liable if he is a party to any employment relationship between Plaintiff and American Family. *See Campbell v. Westdahl,* 148 Ariz. 432, 438-439, 715 P.2d 288, 294-295 (Ariz. Ct. App. 1985). Plaintiff concedes that she did not have an exclusive employment relationship with American Family. Rather, she argues that she had an employment relationship with American Family and Wadlund simultaneously. (Doc. 8, p. 11). Accordingly, if Wadlund and American Family were joint employers of Plaintiff, then Wadlund was a party to the employment relationship between Plaintiff and American

Family and cannot be liable under this tort.

Plaintiff argues that a supervisor of a company may be liable for intentional interference with business expectancy, if that supervisor acts improperly in interfering with a third party's employment contract with their employer. *See Bernstein v. Aetna Life and Casualty*, 843 F.2d 359, 366-367 (9th Cir. 1988); *Wagenseller v. Scottsdale Memorial Hosp.,* 147 Ariz. 370 (Ariz. 1985). However, this case is distinguishable. Both *Bernstein* and *Wagenseller* addressed situations where supervisors of a company improperly discharged an employee and the courts found that the supervisor could be liable for interfering with the former employee's relationship with her employer. However, Wadlund was not Plaintiff's supervisor but her employer and Wadlund was not an employee of American Family but an independent contractor.

Thus, while Plaintiff possibly maintained a joint employment relationship with Wadlund and American Family, she did not maintain any employment relationship with American Family independent of Wadlund. Thus, regardless of whether Wadlund and American Family were Plaintiff's joint employer, Wadlund cannot be found liable pursuant to this tort because he cannot be found liable for interfering with an employment contract to which he was a party.[10]

---

[10] Wadlund decided to hire Plaintiff and then submitted her information to American Family for appointment as a customer service representative. The undisputed evidence establishes that even if American Family declined to appoint Plaintiff as a customer service representative, Wadlund was free to hire Plaintiff for another position with his agency. Thus her employment relationship was principally with Wadlund.

*X.*      *Conclusion*

After a review of the record, the Court finds that there is no genuine issue as to any material fact and Wadlund is entitled to judgment as a matter of law.

Accordingly, IT IS ORDERED:

1.      Defendant Wadlund's Motion to Dismiss (Doc. 4), which was converted into a Motion for Summary Judgment is GRANTED.

Dated this 29th day of March, 2013.


_____
Cindy K. Jorgenson
United States District Judge